**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

UNILEVER, N.V., UNILEVER PLC, CONOPCO, INC. and ALBERTO-CULVER CO.,

*Defendants.*

Case No.: 1:11-cv-0858

Judge: Jackson, Amy, B.

FILED
JUL 19 2011
Clerk, U.S. District & Bankruptcy Courts for the District of Columbia

**FINAL JUDGMENT**

WHEREAS, Plaintiff, United States of America, filed its Complaint on May 6, 2011, and the United States of America and defendants Unilever, N.V., Unilever PLC, Conopco, Inc., (collectively, "Unilever") and Alberto-Culver Company ("Alberto Culver") (collectively, "Defendants"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by Defendants to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires Defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have represented to the United States that the divestitures required below can and will be made and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. Jurisdiction

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states claims upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II. Definitions

As used in this Final Judgment:

(A) "Acquirer" means the person, persons, entity or entities to whom Defendants divest all or some of the Divestiture Assets.

(B) "Alberto Culver" means Defendant Alberto-Culver Co., a Delaware corporation with its headquarters in Melrose Park, Illinois, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

(C) "Alberto VO5 Brand Name" means Alberto VO5 and any other name that uses, incorporates, or references the Alberto VO5 name in the United States, including but not limited

to Alberto VO5 Extra Body Shampoo and Conditioner, Alberto VO5 Normal Shampoo and Conditioner, Alberto VO5 Repair and Protect Shampoo and Conditioner, Alberto VO5 2-in-1 Shampoo and Conditioner, Alberto VO5 Split Ends Shampoo and Conditioner, Alberto VO5 Moisture Milks Shampoo and Conditioner, Alberto VO5 Herbal Escapes Shampoo and Conditioner, Alberto VO5 Tea Therapy Shampoo and Conditioner, Alberto VO5 Silky Experiences Shampoo and Conditioner, Alberto VO5 Perfect Hold Aerosol Hairspray, Alberto VO5 Perfect Hold Non-Aerosol Hairspray, Alberto VO5 Perfect Hold Styling Mousse, Alberto VO5 Perfect Hold Styling Gel, Alberto VO5 Hair Spray Regular, Alberto VO5 Hair Spray Super, Alberto VO5 Hair Spray Brush Out, Alberto VO5 Hair Spray Extra Body, Alberto VO5 Hair Spray Unscented, Alberto VO5 Conditioning Hairdressing, Alberto VO5 Sheer Hairdressing Conditioning Cream, Alberto VO5 Hot Oil Shower Works Conditioning Treatment, Alberto VO5 Hot Oil Moisturizing Conditioning Treatment, Alberto VO5 Detangle and Shine Leave-in Conditioner, Alberto VO5 Total Hair Recovery Conditioning Treatment, and any extensions of any one or more of such products.

(D) "Alberto VO5 Business" means Alberto Culver's business engaged in the research, development, licensing (as licensor or as licensee), production, marketing, servicing or sale of any Alberto VO5 Product, including:

(i) All tangible assets used primarily in the research, development, marketing, or sale of any Alberto VO5 Product including but not limited to licenses, permits or authorizations issued by any governmental organization; contracts, teaming arrangements, agreements, leases commitments, certifications and understandings, including agreements with suppliers, distributors, wholesalers, retailers, marketers, or advertisers; customer lists; accounts, credit record, and related customer information; product inventory;

packaging and artwork relating to such packaging; molds and silk screens; and all performance records and all other records. Provided, however, that Unilever may retain the portions of such tangible assets that relate to products other than any Alberto VO5 Product where such asset reasonably can be divided;

(ii) At the option of the Acquirer, all tangible assets used primarily in the manufacturing of any Alberto VO5 Product, including manufacturing equipment, materials and supplies. Provided, however, that Defendants have no obligation to divest any real property as part of the Alberto VO5 Business;

(iii) All legal rights to the Alberto VO5 Brand Name for use in the United States;

(iv) All intellectual property used primarily in the research, development, production, marketing, servicing, distribution or sale of any Alberto VO5 Product, including but not limited to all legal rights associated with the products, including patents, licenses, and sublicenses, copyrights, Licensed Marks, Trade Dress, and other intellectual property, for use in the United States; and a non-exclusive, transferable, royalty-free right to all other intellectual property used in the research, development, production, marketing, servicing distribution or sale of any Alberto VO5 Product for the purpose of the research, development, production, marketing, servicing, distribution or sale in the United States of any Alberto VO5 Product. Provided, however that with respect to any intellectual property divested pursuant to this subsection (iv) that Defendants have used in products not being divested, the Acquirer shall provide to Defendants a worldwide, non-exclusive, transferable, royalty-free right to use such intellectual property in the research, development, production, marketing, servicing, distribution or sale of any product not

being divested; and

(v) All intangible assets, other than intangible assets set forth in subsection (iv) above, used in the research, development, production, marketing, servicing, distribution or sale of any Alberto VO5 Product in the United States for use in the United States, including all trade secrets; all technical information, computer software and related documentation, know-how, and Formulas, including information relating to plans for, improvement to, or line extensions of, the products under the Alberto VO5 Brand Name; all research, packaging, sales marketing, advertising and distribution know-how and documentation, including plan-o-grams, marketing and sales data, packaging designs, quality assurance and control procedures; all manuals and technical information Alberto Culver provides to its own employees, customers, suppliers, agents or licensees; and all research data concerning historic and current research and development efforts, including, but not limited to, designs of experiments, and the results of successful and unsuccessful designs and experiments. Provided, that with respect to any intangible assets that, prior to the merger, were being used in the research, development, production, marketing, servicing, distribution or sale of any Alberto VO5 Product and any product not being divested, Defendants may utilize and retain the portions of such intangible assets that relate solely to products other than any Alberto VO5 Product where such assets reasonably can be divided, and may utilize and retain copies of such intangible assets that relate to both any Alberto VO5 Product and any other product not being divested.

(E) "Albert VO5 Product" means any product that Alberto Culver sold, sells, or has plans to sell under the Alberto VO5 Brand Name in the United States.

(F) "Defendants" mean Unilever and Alberto Culver.

(G) "Divestiture Assets" mean the Alberto VO5 Business and the Rave Business.

(H) "Formulas" mean all Defendants' formulas, processes, and specifications used by the Defendants in connection with the production and packaging associated with the goods manufactured, distributed, marketed, and sold under a brand name, including, without limitation, Defendants' ingredients, manufacturing processes, equipment and material specifications, trade and manufacturing secrets, know-how, and scientific and technical information.

(I) "Licensed Marks" mean all trademarks, service marks, or trade names belonging or licensed to Defendants (whether registered or unregistered, or whether the subject of a pending application) associated with the goods manufactured, distributed, marketed, and sold under a brand name.

(J) "Rave Brand Name" means Rave and any other name that uses, incorporates, or references the Rave name, including but not limited to Rave 4x Mega Scented Aerosol Hairspray, Rave 4x Mega Scented Non-Aerosol Hairspray, Rave 4x Mega Unscented Aerosol Hairspray, Rave 4x Mega Unscented Non-Aerosol Hairspray, Rave 2x Low Control Bodifying Mousse, Rave 2x Extra Bodifying Mousse, and any extensions of any one or more of such products.

(K) "Rave Business" means Unilever's business engaged in the research, development, licensing (as licensor or as licensee), production, marketing, servicing or sale of any Rave Product, including:

(i) All tangible assets used primarily in the research, development, marketing, or sale of any Rave Product including but not limited to licenses, permits or authorizations issued by any governmental organization; contracts, teaming arrangements, agreements, leases commitments, certifications and understandings, including agreements with suppliers, distributors, wholesalers, retailers, marketers, or advertisers; customer

lists; accounts, credit record, and related customer information; product inventory; packaging and artwork relating to such packaging; molds and silk screens; and all performance records and all other records. Provided, however, that Unilever may retain the portions of such tangible assets that relate to products other than any Rave Product where such asset reasonably can be divided;

(ii) At the option of the Acquirer, all tangible assets used primarily in the manufacturing of any Rave Product, including manufacturing equipment, materials and supplies. Provided, however, that Defendants have no obligation to divest any real property as part of the Rave Business;

(iii) All legal rights to the Rave Brand Name. Provided, however, that Defendants shall not be required to give the Acquirer rights to use the terms "Unilever" or "Suave," or any derivative of the terms "Unilever" or "Suave;"

(iv) All intellectual property used primarily in the research, development, production, marketing, servicing, distribution or sale of any Rave Product, including but not limited to all legal rights associated with the products, including patents, licenses, and sublicenses, copyrights, Licensed Marks, Trade Dress, and other intellectual property; and a non-exclusive, transferable, royalty-free right to all other intellectual property used in the research, development, production, marketing, servicing distribution or sale of any Rave Product for the purpose of the research, development, production, marketing, servicing, distribution or sale of any Rave Product. Provided, however that with respect to any intellectual property divested pursuant to this subsection (iv) that Defendants have used in products not being divested, the Acquirer shall provide to Defendants a worldwide, non-exclusive, transferable, royalty-free right to use such intellectual property

in the research, development, production, marketing, servicing, distribution or sale of any product not being divested; and

(v) All intangible assets, other than intangible assets set forth in subsection (iv) above, used in the research, development, production, marketing, servicing, distribution or sale of any Rave Product, including all trade secrets; all technical information, computer software and related documentation, know-how, and Formulas, including information relating to plans for, improvement to, or line extensions of, the products under the Rave Brand Name; all research, packaging, sales marketing, advertising and distribution know-how and documentation, including plan-o-grams, marketing and sales data, packaging designs, quality assurance and control procedures; all manuals and technical information Unilever provides to its own employees, customers, suppliers, agents or licensees; and all research data concerning historic and current research and development efforts, including, but not limited to, designs of experiments, and the results of successful and unsuccessful designs and experiments. Provided, that with respect to any intangible assets that, prior to the merger, were being used in the research, development, production, marketing, servicing, distribution or sale of any Rave Product and any product not being divested, Defendants may utilize and retain the portions of such intangible assets that relate solely to products other than any Rave Product where such assets reasonably can be divided, and may utilize and retain copies of such intangible assets that relate to both any Rave Product and any other product not being divested.

(L) "Rave Product" means any product that Unilever sold, sells, or has plans to sell under the Rave Brand Name anywhere in the world.

(M) "Trade Dress" means the print, style, color, labels, and other elements of trade dress currently used by Defendants and/or their subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures in association with the goods manufactured, distributed, marketed, and sold under a brand name.

(N) "Unilever" means defendants Unilever, N.V. and Unilever PLC, corporations respectively organized under the laws of the Netherlands and England, with headquarters in Rotterdam and London, and their successors and assigns, their subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their respective directors, officers, managers, agents, and employees. Unilever includes Conopco, Inc., a New York corporation, a wholly owned subsidiary of Unilever N.V. and Unilever PLC.

## III. Applicability

(A) This Final Judgment applies to all Defendants, as defined above, and all other persons in active concert or participation with the Defendants who receive actual notice of this Final Judgment by personal service or otherwise.

(B) If, prior to complying with Section IV or V of this Final Judgment, Defendants sell, license, or otherwise disposes of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, Defendants shall require the purchaser(s) to be bound by the provisions of this Final Judgment. Defendants need not obtain such an agreement from the Acquirer(s) of the assets divested pursuant to this Final Judgment.

## IV. Divestitures

(A) Defendants are ordered and directed, within ninety (90) calendar days after the filing of the Proposed Final Judgment or five (5) calendar days after entry of this Final Judgment by the Court, whichever is later, to divest the Divestiture Assets in a manner consistent with this

Final Judgment to an Acquirer or Acquirers acceptable to the United States in its sole discretion. The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty (60) calendar days in total, and shall notify the Court in such circumstances. Defendants agree to use their best efforts to divest the Divestiture Assets as expeditiously as possible.

(B) In accomplishing the divestiture ordered by this Final Judgment, Defendants promptly shall make known, by usual and customary means, the availability of the Divestiture Assets. Defendants shall inform any person who inquires about a possible purchase of the Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment. Defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Divestiture Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client privilege or work-product doctrine. Defendants shall make available such information to the United States at the same time that such information is made available to any other person.

(C) Defendants shall provide the Acquirer(s) and the United States with information relating to the personnel involved in the design, product development, management, operations, or sales activities relating to the Divestiture Assets to enable the Acquirer(s) to make offers of employment. Defendants will not interfere with any negotiations by the Acquirer(s) to employ or contract with any Defendants' employee whose primary responsibility relates to the Divestiture Assets. Interference with respect to this paragraph includes, but is not limited to, offering to increase an employee's salary or benefits other than as a part of a company-wide increase in salary or benefits. In addition, for each employee who elects employment by the

Acquirer or Acquirers, Defendants shall vest all unvested pension and other equity rights of that employee and provide all benefits to which the employee would have been entitled if terminated without cause.

(D) Defendants shall waive all noncompete agreements for any current or former employee employed in the design, development, production, marketing, servicing, distribution, and/or sale of any of the Divestiture Assets who the Acquirer(s) employs with relation to the Divestiture Assets.

(E) Defendants shall permit prospective Acquirers of the Divestiture Assets to (1) have reasonable access to personnel; (2) make reasonable inspections of the physical facilities; (3) access to any and all environmental, zoning, and other permit documents and information; and (4) access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

(F) Defendants shall warrant to the Acquirer(s) that the Divestiture Assets will be operational on the date of sale.

(G) Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divestiture Assets.

(H) In connection with the divestiture of the Divestiture Assets pursuant to Section IV, or by trustee appointed pursuant to Section V of this Final Judgment, at the option of the Acquirer(s), the Defendants shall enter into transitional supply and services agreements, up to six (6) months in length, for the supply of Alberto VO5 and/or Rave Products and the provision of services required to transfer the Alberto VO5 and/or Rave Businesses to the Acquirer(s). At the request of the Acquirer, the United States, in its sole discretion, may agree to one or more extensions of this time period, not to exceed twelve (12) months in total. The terms and

conditions of such agreements must be acceptable to the United States in its sole discretion. Upon the expiration or termination of such agreements, the Defendants shall not enter into or have any supply or service agreements with the Acquirer(s) relating to the sale of the Alberto VO5 and/or Rave Products for a period of three (3) years thereafter.

(I) Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV, or by trustee appointed pursuant to Section V of this Final Judgment, shall include the entire Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the divestiture will achieve the purposes of this Final Judgment and that the Divestiture Assets can and will be used by the Acquirer(s) as part of viable, ongoing business engaged in the sale of shampoo, conditioner, and/or hairspray. Divestiture of the Divestiture Assets may be made to one or more Acquirers, provided that in each instance it is demonstrated to the sole satisfaction of the United States that the Divestiture Assets will remain viable and the divestiture of such assets will remedy the competitive harm alleged in the Complaint. The divestitures, whether pursuant to Section IV or Section V of this Final Judgment:

(i) shall be made to an Acquirer or Acquirers that, in the United States' sole judgment, has or have the intent and capability (including the necessary managerial, operational, technical, and financial capability) of competing effectively in the sale of shampoo, conditioner and/or hairspray; and

(ii) shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between an Acquirer and Defendants give Defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

## V. Appointment of Trustee

(A) If Defendants have not divested the Divestiture Assets within the time period specified in Section IV(A), Defendants shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to effect the divestiture of the Divestiture Assets.

(B) After the appointment of a trustee becomes effective, only the trustee shall have the right to sell the Divestiture Assets. The trustee shall have the power and authority to accomplish the divestiture to an Acquirer acceptable to the United States at such price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court deems appropriate. Subject to Section V(D) of this Final Judgment, the trustee may hire at the cost and expense of Defendants any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestiture.

(C) Defendants shall not object to a sale by the trustee on any ground other than the trustee's malfeasance. Any such objections by Defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

(D) The trustee shall serve at the cost and expense of Defendants, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals

and agents retained by the trustee, all remaining money shall be paid to Defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

(E) Defendants shall use their best efforts to assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the Divestiture Assets, and Defendants shall develop financial and other information relevant to the Divestiture Assets as the trustee may reasonably request, subject to reasonable protection for trade secrets or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

(F) After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

(G) If the trustee has not accomplished the divestiture ordered under this Final

Judgment within six (6) months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture, (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished, and (3) the trustee's recommendations. To the extent the report contains information that the trustee deems confidential, the report shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States, which shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VI. Notice of Proposed Divestiture

(A) Within two (2) business days following execution of a definitive divestiture agreement, Defendants or the trustee, whichever is then responsible for effecting the divestiture required herein, shall notify the United States of any proposed divestiture required by Section IV or V of this Final Judgment. If the trustee is responsible, it shall similarly notify Defendants. The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

(B) Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from Defendants, the proposed Acquirer(s), any other third party, or the trustee, if applicable, additional information concerning the proposed divestiture, the proposed Acquirer(s), and any other potential Acquirer. Defendants and the trustee shall furnish

to the United States any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

(C) Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from Defendants, the proposed Acquirer(s), any third party, and the trustee, whichever is later, the United States shall provide written notice to Defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to Defendants' limited right to object to the sale under Section V(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer(s) or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by Defendants under Section V(C), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

## VII. Financing

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Final Judgment.

## VIII. Hold Separate

Until the divestiture required by this Final Judgment has been accomplished, Defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestiture ordered by this Court.

## IX. Affidavits

(A) Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV or V, Defendants shall deliver to the United States an affidavit as to the fact and manner of their compliance with Section IV or V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts Defendants have taken to solicit buyers for the Divestiture Assets and to provide required information to prospective Acquirers, including the limitations, if any, on such information. Provided that the information set forth in the affidavit is true and complete, any objection by the United States to information provided by Defendants, including any limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

(B) Within twenty (20) calendar days of the filing of the Complaint in this matter, Defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions Defendants have taken and all steps Defendants have implemented on an ongoing basis to comply with Section VIII of this Final Judgment. Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in Defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

(C) Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one (1) year after such divestiture has been completed.

## X. Compliance Inspection

(A) For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time authorized representatives of the United States, including consultants and other persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Defendants, be permitted:

(i) access during Defendants' office hours to inspect and copy, or at the option of the United States, to require Defendants to provide hard copy or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendants, relating to any matters contained in this Final Judgment; and

(ii) to interview, either informally or on the record, Defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

(B) Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Defendants shall submit written reports or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested, including, but not limited to, any transitional supply and/or services agreements entered into between the Acquirer(s) and the Defendants pursuant to Section IV(H) of this Final Judgment.

(C) No information or documents obtained by the means provided in this Section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

(D) If at the time information or documents are furnished by Defendants to the United States, Defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States shall give Defendants ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XI. No Reacquisition

Defendants shall not reacquire any part of the Divestiture Assets during the term of this Final Judgment.

## XII. Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIII. Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten (10) years

from the date of its entry.

**XIV. Public Interest Determination**

The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States's responses to those comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and responses to comments filed with the Court, entry of this Final Judgment is in the public interest.

Date: July 19, 2011

Court approval subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. § 16.

United States District Judge